FILED
9/23/15 3:24 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| ERICA LYBROOK, | : | Case No. 14-10236-TPA |
| *Debtor* | : | |
| | : | Chapter 7 |
| JOHN C. MELARAGNO, TRUSTEE | : | |
| *Plaintiff* | : | Adv. No. 14-1060 |
| | : | |
| v. | : | Related to Doc. No. 1 |
| | : | |
| ERICA LYBROOK, | : | |
| *Defendant* | : | |

*Appearances:  John C. Melaragno, Esq., Chapter 7 Trustee, Plaintiff*
*Tina M. Fryling, Esq., for the Defendant*

## MEMORANDUM OPINION

On March 2, 2014, the Debtor, Erica Lybrook, filed a voluntary Petition under Chapter 7 of the Bankruptcy Code. Currently before the Court is a ***Complaint to Determine Dischargeability of Debt*** ("Complaint") filed by Plaintiff, Atty. John C. Melaragno, Chapter 7 Trustee ("Trustee").  The Complaint seeks to deny the Debtor a discharge under *11 U.S.C. §727(a)(2)* for allegedly transferring property with intent to hinder, delay or defraud creditors, and pursuant to *§727(a)(4),* for allegedly making a false oath or account in connection with the bankruptcy case.[1] Following trial on the *Complaint,* the Parties filed their post-trial briefs and,

---

[1]    It should be noted that the Complaint also includes counts objecting to discharge pursuant to *11 U.S.C. §§727(a)(3)* and *727(a)(5)*.   The Trustee, however, did not address those provisions in his pretrial narrative statement, or at trial, or in his post-trial brief, and therefore the Court presumes he has abandoned these alternative theories.

having considered all the evidence and the respective arguments, for the reasons stated below, the

Court finds that the Trustee has met his burden of proving the elements of *Sections 727(a)(4)(A)*,

and therefore, the Debtor's discharge will be denied on that basis.[2]


### *FACTS*


The Debtor was formerly known as Erica Eliason.  On July 2, 2011, the Debtor and

Shane Lybrook, Sr. ("Shane")[3] were married and at that time she adopted her current name.  For

convenience, the Debtor and Shane  are sometimes referred to collectively in this *Opinion* as "the

Lybrooks" with regard to events occurring after the date of their marriage.  The facts that are

relevant for the Court's decision can best be understood if broken down to correspond to the two

grounds on which the Trustee is objecting to discharge.


### *(A) As Relevant to Section 727(a)(2)*


The Trustee bases his *Section 727(a)(2)* objection to discharge claim on a series of

transactions involving the Debtor and  Shane that occurred during the three-year period prior to the

Debtor's bankruptcy filing.  The Trustee contends that through the means of these transactions,

which involved real property and motor vehicles, the Debtor intentionally and systematically acted

---

[2]    The Court's jurisdiction under *28 U.S.C. 157* and *1334* was not at issue. This is a core proceeding pursuant to *28 U.S.C. 157(b)(2)(J)*.

[3]    On October 13, 2010, Shane Lybrook, Sr, filed his own Chapter 7 Bankruptcy at Case No. 10-11872.  The Court takes judicial notice of the records in that case indicating it was identified as a "no asset" case on January 20, 2011, with Shane being discharged and the case closed on March 22, 2011.

to transfer assets in which she held an interest into the sole ownership of Shane in order to shield them from her creditors.

Beginning with the real estate transactions, on June 1, 2010, the Debtor and Shane entered into Articles of Agreement for the Sale of Real Estate ("Land Contract") for the purchase of 9797 Mark Road, Erie PA ("Mark Road Property") for a price of $60,000.  The record is not clear as to how they were to take title to the Mark Road Property.  Under the Land Contract, the Debtor and Shane agreed to pay  equal monthly installments of $500 per month for the first year, with a balloon payment of the $54,000 balance due on June 1, 2011.

On March 10, 2011, the Mark Road Property was destroyed by fire and declared a total loss. As a result of the fire, the property insurer paid the following amounts: (a) $55,000 to the Seller under the terms of the Land Contract; (b) $102,500 to the Debtor and Shane for the balance of the structure loss; and, (c) $72,607.01 to the Debtor and Shane for personal property loss, the majority of which was attributable to personal property owned by the Debtor individually.  On June 24, 2011, the Debtor and Shane sold the Mark Road Property for $15,000.

On May 6, 2011, the Debtor and Shane  purchased 8571 Lake Pleasant Rd., Erie, PA for $114,502.50,  paid in cash at the time of the closing ("Lake Pleasant Road Property).  Again, this was prior to their marriage and the record is not entirely clear as to how title to the Lake Pleasant Road Property was held, though the Parties have stipulated it was "jointly purchased."   On April 20, 2012, Shane individually borrowed $32,250 from General Electric Federal Credit Union, ostensibly for the construction of a garage, secured by a mortgage on the Lake Pleasant Road

3

Property.  A portion of the loan proceeds were paid to a contractor to build a garage.  He completed

the framing but never finished the garage.  Eventually, the Lybrooks initiated criminal proceedings

against the contractor for his failure to complete the garage and a  $5,000 restitution order against

him was ultimately entered in their favor.

On January 31, 2013, the Lybrooks sold the Lake Pleasant Road property for

$123,000, receiving $79,988.10 in net proceeds after satisfaction of the General Electric Federal

Credit Union mortgage and payment of closing costs. Thereafter, on March 25, 2013, Shane,

individually, purchased 2326 Victory Drive, Erie, PA ("Victory Drive Property") for $142,000. He

financed $115,588 of the purchase price for the Victory Drive Property and, after application of a

$1,000 deposit he had made and a $5,000 seller's assistance, he was required to bring $28,218.61

to the closing to complete the transaction.  The source of funds used by Shane for both the deposit

and the closing was the Lybrook's joint bank account into which the net proceeds from the sale of

the Lake Pleasant Property had been placed.   The Parties have stipulated that the Victory Drive

Property transaction thus amounted to a transfer of assets from the Debtor to Shane of $14,609

(($1000 + $28, 218) ÷ 2).

Regarding the vehicle transactions, on April 26, 2011, the Debtor and Shane jointly

purchased a 2004 Mazda RX-8 ("Mazda") for $12,938.50. On May 7, 2012, Shane purchased a 2012

Chrysler Town and Country ("Chrysler") financed through Ally Bank and titled solely in his name.

On February 4, 2013, Shane satisfied Ally Bank's lien on the Chrysler by paying $27,581.06, which

he obtained  from the net sale proceeds of the Lake Pleasant Road Property retained in the couple's

joint bank account.

4

On March 29, 2013, the Mazda was traded in for a 2013 Dodge Ram Truck leased in Shane's name only.  The trade-in value of the Mazda in this transaction was $7,600.  On September 7, 2013, Shane traded the Chrysler for a 2007 Mercury Mountaineer ("Mercury") titled jointly in the name of the Lybrooks. On January 18, 2014, the Mercury was traded in for a 2014 Jeep Cherokee leased in Shane's name only.

The Trustee argues that the record clearly demonstrates that the Debtor caused or knowingly permitted $17,590.53 of her assets to be transferred to Shane as a result of these vehicle transactions. This amount is comprised of one-half of the $27,581.06 loan payoff to Ally Bank for the Chrysler and one-half of the $7,600 trade in value on the Mazda.

In total, as an aggregate result of the real estate sales and vehicle transactions outlined above, the Trustee contends that during the relevant period of time the Debtor transferred at least a total of $32,199.53 to Shane with the intent to hinder, delay or defraud creditors by effectively converting that value of jointly held property into individual property of Shane.

*(B) As Relevant to Section 727(a)(4)*

Schedules A and B of the Debtor's  Petition state that at the time of her bankruptcy filing she did not own any real property, furs or jewelry.  She  listed household goods and furnishings owned by her as having a total value of merely $1,500.  Her Schedule B indicated that she was not owed any tax refund nor did it disclose entitlement to any monies dues as a result of a criminal restitution order.

5

According to the Debtor's Schedule F, the Debtor was faced with $84,257 of unsecured debt at the time of filing.  The Debtor's Statement of Financial Affairs ("SOFA") stated or declared that prior to filing, she did not transfer any assets and was not self-employed within the prescribed time periods.  The Debtor signed and acknowledged her bankruptcy petition, declaring under oath and penalty of perjury that the information she provided was true and correct.

On April 2, 2014, the Section 341 Meeting of Creditors was held. At the 341 Meeting, the Debtor, while in the company of her attorney,  testified in answer to questions posed to her by the Trustee as follows:

> Q.    Did you review the petition and schedules and do they accurately reflect all your assets and liabilities?
> A.    Yes.
> Q.    Did you sign the petition, schedules, statements, and related documents?
> A.    Yes.
> Q.    Did you read these documents before you signed them?
> A.    Yes.
> Q.    Are there any errors or omissions to bring to my or the Court's attention at this time?
> A.    No.
> Q.    In the *five years* prior to your Bankruptcy filing, did you give away, transfer, or sell any of your assets property to anyone? (emphasis added)
> A.    No.
> Q.    In the *ten years* prior to filing, did you transfer, sell or give away any real estate? (emphasis added)
> A.    No.

*Stipulation* 39.  The Trustee contends that the Debtor made numerous false statements in her Schedules, SOFA, and at the Meeting of Creditors.

### DISCUSSION

The purpose of bankruptcy is to afford a debtor a "fresh start."  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). Denial of a discharge should only occur in extreme circumstances and objections to discharge should be liberally construed in favor of the debtor. *Emerson v. Adalian*, (*In re Adalian*)*,* 474 B.R. 150, 160 (Bankr. M.D. Pa. 2012). Nonetheless, a discharge is a privilege and not an absolute right and is meant only to discharge the honest, but unfortunate debtor.  *Good v. Kantorik¸* (*In re Kantorik*), 475 B.R. 233, (Bankr. W.D. Pa. 2012) (citing *The Cadle Co. v. Ogalin* (*In re Ogalin*)*,* 303 B.R. 552, 557 (Bankr. D. Conn. 2004)). The Trustee, as the Plaintiff, bears the burden of proof, by a preponderance of the evidence, as to any objection to discharge he raises. *Fed.R.Bankr.P.4005*; *Melarango v. Ciotti,* (*In re Ciotti*), 448 B.R. 694, 701 (Bankr. W.D. Pa 2011); *see also Grogan*, 498 U.S. 279 at 290.

As was indicated above, in this case the Trustee is objecting to discharge on two separate grounds.  The relevant provisions of the Bankruptcy Code for purposes of the present case provide:

> (a) The court shall grant the debtor a discharge, unless–
> > ...
>
> > (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
>
> > > (A) property of the debtor, within one year before the date of the filing of the petition;
> > >
> > > ...

(4) the debtor knowingly and fraudulently, in or in connection
with the case--

    (A) made a false oath or account;

*11 U.S.C. §§727(a)(2)(A)* and *(a)(4)(A)*.  For purposes of this discussion, the Court will reverse the order of these provisions because it finds that a much clearer case has been made by the Trustee under *Section 727(a)(4)(A)*.

### False Oath or Account—Section 727(a)(4)(A)

The purpose behind *Section 727(a)(4)(A)* is "to ensure that the debtor provides honest and reliable information to the trustee and others interested in the administration of the estate without their having to conduct costly investigations to discover the debtor's true financial condition."  *In re Singh,* 433 B.R. 139, 154 (Bankr. E.D. Pa. 2010).  To successfully challenge a debtor's discharge under this provision, the objecting party must prove the following by a preponderance of the evidence:

    (1)    the debtor made a statement under oath;

    (2)    the statement was false;

    (3)    the debtor knew the statement was false;

    (4)    the debtor made the statement with the intent to deceive; and

    (5)    the statement related materially to the bankruptcy case.

*Cadle Co. v. Zofko*, 380 B.R. 375, 382 (W.D. Pa. 2007).  Each of these required elements will be examined in turn in light of the record evidence that has been presented.

8

With respect to the first element, the Trustee points to statements made by the Debtor in her bankruptcy Schedules and SOFA, as well as her testimony at the Section 341 Meeting of Creditors, as statements made under oath.  A debtor's failure to list in her bankruptcy Schedules and SOFA all assets owned by her can constitute a false oath or account since these statements are made under oath.  *Zofko* at 384; *Singh* at 154.  A false oath may include a knowing and fraudulent omission, including omissions from the SOFA or Schedules.  *In re Dolata*, 306 B.R. 97, 148 (Bankr. W.D. Pa. 2004).  Statements made when one is testifying at a Section 341 Meeting of Creditors are made under oath and can therefore also serve as  the basis for a denial of discharge under *Section 727(a)(4)(A).  See, Bielan, Miklos & Makrogiannis v. Vasquez*, 2010 WL 1644175 *6  (Bankr. D. N.J. 2010).  The first element is thus met.

The second element requires the Trustee to show the statements were false.  Among the allegedly false statements under oath made by the Debtor that the Trustee points to are the following:[4]

- On Schedule B, Item No. 7, the Debtor indicated "NONE" for furs and jewelry when in  fact at the relevant time she owned jewelry with a value of over $8,500.

- On Schedule B, Item No. 21, the Debtor indicated "NONE" for contingent and unliquidated claims of every nature, including tax refunds, when in fact she was expecting a tax refund of $10,207 at the time.   She likewise indicated "NONE" for Item No. 18 which asked about other liquidated debts owed to her, including tax refunds.

---

[4]    Each of the following "statements" is taken from the Schedules or SOFA filed on behalf of the Debtor and signed by her under penalty of perjury, or from the Debtor's sworn testimony at the Meeting of Creditors.  The Debtor has not denied making any of the statements relied upon by the Trustee.

- Debtor's Schedule B failed to set forth the $5,000 criminal restitution order anywhere.

- On Schedule B, Item No. 2, dealing with checking, savings or other financial accounts, the Debtor listed one "PNC Checking account-joint with spouse," but failed to list two other joint accounts she had with Shane.

- Schedule B, Item No. 4, dealing with household goods and furnishings, states that the Debtor owned "Furniture, etc." with a total value of $500, but upon questioning by the Trustee at trial, the Debtor identified household goods owned by her with a value of $6,210.

- The Debtor's SOFA, Item No. 10 states that the Debtor did not make any transfers of property within the two years prior to filing for bankruptcy even though she had sold the Lake Pleasant Road Property, and traded in the Mazda and the Mercury. None of the transfers of funds from the Debtor during that time period to Shane and enabling him to make individual purchases, such as his purchase of the Victory Drive Property, were disclosed either.

- The Debtor's SOFA, Item No. 18 states that she was not involved in any self-employment or business ventures, either full or part time, within the six years preceding her bankruptcy filing, when in fact at trial she admitted she was involved in the business of selling "body wraps" in 2013 and babysitting from 2010 through May 2011.

- At the Section 341 Meeting of Creditors, the Trustee questioned the Debtor regarding whether in the preceding five years, she gave away, transferred, or sold any of her assets or property to anyone else and the Debtor answered "No" without equivocation.

- At the Section 341 Meeting of Creditors the Trustee also asked the Debtor whether in the ten years prior to her bankruptcy filing she had transferred, sold, or given away any real estate and she answered "No."

Each of the above represents a demonstrably false statement under oath made by the Debtor.

Evidentiary support demonstrating that the foregoing statements were false at the time made is

10

shown in and supported by the Stipulations of the Parties, the Debtor's trial testimony and the Exhibits submitted into evidence at trial by the Trustee.  As such, the second element is clearly met.

Under the third element the Trustee must prove by a preponderance of the evidence that the debtor knew the statements were false.  A statement is considered to have been made with knowledge of its falsity for discharge denial purposes if it was known by the Debtor to be false, was made without belief in its truth, or was made with reckless disregard for the truth.  *In re Oakley*, 503 B.R. 407, 426 (Bankr. E.D. Pa. 2013).

The subjects of the false statements made by the Debtor in this case were not particularly complicated or esoteric.  They all related to the sort of basic financial information concerning oneself that the ordinary person would reasonably be expected to instantly know about, at least in general terms, without even having to investigate or dig into records: whether or not one owns jewelry, whether or not one is due a large tax refund, whether or not one has recently transferred any real property, etc.  The Court was able to observe the Debtor during her testimony at trial and found her to be a coherent and intelligent woman.  There was certainly nothing in her manner or testimony that would cause the Court to believe she had any cognitive impairment or other condition that might call into question the expectation that she must have known she was making false statements.  The Court thus finds that the third element has been met.

The fourth element the Trustee must preponderantly prove is that the Debtor made the false statements with the intent to deceive.  This appears to be the crux of the matter, with the Debtor having offered up a variety of explanations as to why the false statements were not made with any intention to deceive.

11

First, as to the relevant legal standard to be applied, it is well-recognized that direct evidence of a debtor's fraudulent intent will seldom be forthcoming since the debtor will usually be the only person who can directly testify concerning her intent. Since a debtor is unlikely to testify that her intent was fraudulent, courts are permitted to infer a fraudulent intent from all the facts and circumstances of a case. *In Re Oakley*, 503 B.R. 407, 426 (Bankr. E.D. Pa 2013) (quoting *In re Williamson*, 828 F.3d 249, 252 (4th Cir. 1987)). Such circumstances can include a pattern of nondisclosure and errors and the debtor's reckless indifference to the truth. *Zofko*, 380 B.R. at 384; *Oakley*, 503 B.R. at 426 (reckless indifference to the truth can be inferred from numerous errors and omissions in the bankruptcy Schedules or SOFA). The Court may also take into account the demeanor of the debtor when testifying at trial in assessing whether errors and omissions stemmed from reckless indifference or were inadvertent, honest mistakes. *Singh*, 433 B.R. at 159.

In applying this standard the Court finds as a starting point that the facts and circumstances are at least strongly suggestive of a fraudulent intent by the Debtor. The pervasive pattern of omissions and errors outlined previously goes well beyond what might be attributable to honest mistake and is hard to explain other than as the product of a deliberate attempt to deceive, or at the very least a reckless indifference to the truth, which is itself a sufficient basis to meet the fourth element.

At trial the Debtor attempted to portray the various false statements as merely mistakes, or misinterpretations by her as to the information she was being asked to provide. The Court does not find these explanations to be credible. To begin with, the Debtor's demeanor was troubling. From the very outset of her testimony she displayed a disrespectful, indignant, and

sometimes flippant attitude in response to the Trustee's questioning that the Court found wholly inappropriate to the serious matter at hand.  While the Court is keenly aware of the stressful position the Debtor was in, and makes allowance for that, it was nevertheless struck by the complete absence of any sign of remorse or chagrin that might be expected from someone who has innocently made numerous false statements under oath in a legal proceeding.

On a substantive level, none of the various explanations by the Debtor were convincing, and in some instances they were contradictory.  For example, at one point in her testimony she tried to explain why she had not disclosed any jewelry personal property items on her Schedule B by saying that everything she had was a gift and she believed she only had to disclose those items she purchased herself. Later, however, she admitted having personally spent close to $6,000 when buying herself the engagement ring that she failed to disclose.  As another example, while acknowledging that the 2013 income tax return for her and Shane had been prepared on February 10, 2014, a mere 3 weeks prior to her bankruptcy filing, and that it indicated the Lybrooks would be receiving a tax refund of over $10,000, the only reason she could provide for why she did not report that in her Schedule B when there were categories in the form specifically asking about tax refunds was that she did not know what the form meant.  The Court finds such testimony wholly incredible.  The Debtor also attempted to blame the chaos caused by the Mark Road Property fire as being responsible for her false statements.  That fire, however, occurred more than three years prior to the bankruptcy filing and it appears the Debtor was fully and promptly compensated for her financial loss by insurance payments. The Court does not accept the fire as an excuse.

13

During her testimony the Debtor also tried to deflect questions from the Trustee by stating that she could not remember having reviewed the bankruptcy documents with her attorney before they were filed.  The Court took this as an effort by the Debtor to suggest that perhaps the documents had not been prepared accurately by the attorney, something for which it would be unfair to hold her responsible.  Unfortunately for the Debtor, the Trustee was able to point out that she testified at the Meeting of Creditors that she had reviewed the documents before signing them, and that there were no errors or omissions in them that should be brought to the Court's attention.  (The relevant testimony was previously quoted, *supra*).  Moreover, even if the Court were to credit the Debtor's trial testimony to the effect that she did not review the documents before signing them, that would not help her because signing the documents without having reviewed them is in itself a false statement and evidence of a reckless indifference to the truth.  *See, Dolata*, 306 B.R. at 149-50.

Yet another reason for the court's conclusion that the Debtor had an intent to deceive is the failure on her part to correct any of the omissions after they were pointed out to her.  At the 341 Meeting of Creditors she was directly asked questions about transfers of property and she falsely denied that any such transfers had occurred in the time period specified by the Trustee.  If her failure to report such transfers in the SOFA had truly been an inadvertent mistake, she thus had a perfect opportunity to correct the record when those very clear questions were asked of her, but she did not do so.  She has also known since at least the time this adversary proceeding was filed that the Trustee was claiming that  she had made false statements in her Schedules and SOFA, and she had to know there were false statements in those documents.  Despite this knowledge, the Debtor has never sought to amend these documents to remove the false statements, which failure is itself

14

evidence of a reckless disregard of the truth that is equivalent to fraudulent intent. *In re Dolata*, 308 B.R. 97, 155 (Bankr. W.D. Pa. 2004).

All of the relevant evidence[5] thus leads the Court to the conclusion that the false statements were not made innocently by the Debtor, but rather with an intent to deceive. The fourth element has thus been proven by the Trustee.

The final element under *Section 727(a)(4)(A)* is materiality. This requirement obviously is designed to screen out cases involving *de minimus*, trivial or completely irrelevant falsehoods that could otherwise cause a debtor to be denied a discharge. The test for materiality is "whether the subject matter of the false oath 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Zofko*, 380 B.R. at 383 (quoting *In re Chalk*, 748 F.2d 616 (11th Cir. 1984)). The omission of assets having even little value can be material, and proof of actual harm to creditors caused by the omission is not necessary. *Id.*

The Court has little trouble concluding that the false statements made by the Debtor in this case meet the standard of materiality. The Debtor has been proven to have failed to disclose

---

[5]     The Court also notes that the Trustee introduced evidence at trial, without objection by the Debtor,   that tended to show that the Debtor had made false representations to the Erie County Assistance Office in connection with benefits received by her under the "SNAP" program during the period from 2011 through 2014. These misrepresentations included the failure to identify a motor vehicle owned by a member of her household, failure to list a bank account that contained $8,000 at the time, and indicating that information had not changed from a prior application, when in fact it had. By this evidence the Trustee apparently hoped to call into question the Debtor's general character for truthfulness or untruthfulness. *See, F.R.E. 608(b)*. Even though the Debtor did not object to this evidence, the Court has given it little weight, finding it only mildly probative on the issues presented in this case.

15

assets with a total value in excess of $20,000 (jewelry, household goods, tax refund, restitution order, joint bank accounts). Her failure to disclose the transfers of real estate and motor vehicles implicated possible fraudulent transfer actions for the recovery of over $30,000 in asset transfers from her to Shane. Her failure to disclose her self-employment business activities implicated the Trustee's ability to investigate her overall financial situation. *See, e.g., In re Strickland*, 350 B.R. 158, 165 (Bankr. D. Del. 2006) ( business interest even of nominal value relates to debtor's business dealings and requires disclosure).

The Trustee having proven all required elements, the Debtor will be denied a discharge pursuant to *11 U.S.C. §727(a)(4)(A)*. The Court having so concluded could stop here without considering the alternative ground of *Section 727(a)(2)* advanced by the Trustee. *See, e.g., In re Gobindram*, 2014 WL 2809078 (Bankr. E.D.N.Y. 2014) (where court found that debtor should be denied discharge under *Section 727(a)(4)(A)*, it declined to rule on alternate *Section 727(a)(2)(A)* theory). Nevertheless, for the sake of completeness the Court will consider the alternative ground as well.

### *Improper Transfer of Property–Section 727(a)(2)(A)*

To prevail on a cause of action under *Section 727(a)(2)(A)*, the Trustee must prove by a preponderance of the evidence:

(1)    a disposition of property, such as a transfer or concealment;

(2)    a subjective intent on the debtor's part to hinder, delay, or defraud one or more creditors or the bankruptcy trustee through the disposition; and,

(3)    that both the disposition and subjective intent occurred within one year before the petition date.

16

*Ciotti,* 448 B.R. at 701 (citations omitted).  Accordingly, a denial of a debtor's discharge under *Section 727(a)(2)(A)* requires both an act and an improper motive, such as a transfer of the debtor's property coupled with an actual intent to hinder, delay, or defraud creditors. *Id.*  There is no concept of a "constructive" fraudulent transfer when applying this section. *Id.* As in the previous section of this *Opinion*, the Court will examine each of these elements, though in this instance for reasons of logical flow it will reverse the order of consideration of the second and third elements.

The Trustee must first identify a disposition of property, such as a transfer or concealment.  He points to three such transfers, all made to Shane.  Two of the transfers came from the Debtor's share of the proceeds from the sale of the Lake Pleasant Road Property:  $14,609 which Shane used to buy the Victory Drive Property and $13,790.53 which he used to pay off the loan on the Chrysler.  The third transfer identified by the Trustee is the Debtor's one-half share of the trade-in value of the Mazda, or $3,800, which as indicated above was used by Shane to acquire a leased 2013 Dodge Ram truck.  See Trustee's Post-trial Brief at 9.  These all appear to qualify as "transfers" within the meaning of the statute, and the Debtor has not argued otherwise.  The Court finds that the Trustee has met the first element under *Section 727(a)(2)(A).*

The Court next turns to the third element, which requires the Trustee to show that both the disposition and a subjective intent to hinder, delay or defraud creditors occurred within one year before the petition date.  The key date for such inquiry, then, is March 2, 2013.  It can quickly be seen that two of the three transfers identified by the Trustee occurred after that date, *i.e.*, Shane's purchase of the Victory Drive Property on March 25, 2013, using funds of the Debtor, and his trade-in of the Mazda on March 29, 2013.  If the Trustee can show that those transfers were done with the

subjective intent to hinder, delay or defraud creditors (something addressed below), the third element will have been met with respect to them.  The third transfer identified by the Trustee, the payoff of the Chrysler loan, is more problematic for him because it occurred on February 4, 2013, more than one year prior to the Debtor's bankruptcy filing. Thus, unless the Trustee can provide some reason why this transfer should be considered even though it occurred outside the one-year window provided by the statute, the Court will disregard it in deciding whether the Trustee has proven his case under *Section 727(a)(2).*

The Trustee seems to recognize this as a problem because in his post-trial brief he devotes some effort to highlighting that the Debtor concealed the existence of the transfers at issue, including the Chrysler payoff, by failing to disclose them in her SOFA and falsely answering questions at the 341 Meeting of Creditors, suggesting that because such concealment itself occurred after March 2, 2013, the explicit one-year statutory window for the occurrence of the disposition is thereby rendered nugatory.  The Trustee, however, has provided no authority to support such a proposition, and after careful consideration the Court rejects it.

The Trustee's argument seems to be based on the fact that a concealment is one of the types of disposition enumerated in *Section 727(a)(2).* However, it must be kept firmly  in mind that the concealment contemplated by the statute is not just an amorphous, free-floating concept of hiding something, but the very specific act of a concealment of property of the Debtor.  By her SOFA omissions and false statements at the Meeting of Creditors, the Debtor was not concealing property of the estate, because  the property in question had already been transferred, she was concealing the transfers.  That is not sufficient to trigger the statute. *See , Rosen v. Benzer*, 996 F.2d

18

1527, 1532 (3d Cir. 1993) (critical under the concealment provision of *Section 727(a)(2)* is whether there is concealment of property, not whether there is concealment of a transfer).

The Court's own research has indicated that the Third Circuit does recognize something called the "continuing concealment doctrine" in regard to actions under Section *727(a)(2)*. *See, e.g., Rosen, supra,* and *In re Von Kiel,* 550 Fed. Appx. 105 (3d Cir. 2013). Under this doctrine, a concealment initiated prior to the one-year period but continuing into that period will fulfill the act requirement under the statute. This doctrine, for example, is intended to capture the situation where a debtor transfers title to property while secretly retaining the benefits of ownership in it. As the *Rosen* court stated:

> In a situation involving a transfer of title coupled with retention of the benefits of ownership, there may, indeed, be a concealment of property. Where this is the case, however, the concealment is present not because retention of the benefits of ownership conceals the fact that the debtor no longer has legal title, but rather because the transfer of title represents to the world that the debtor has transferred away all his interest in the property while in reality he has retained some secret interest—a secret interest of which retention of the benefits of ownership may be evidence. *A legally relevant concealment can exist, however, only if there is, in fact, some secret interest in the property retained by the debtor.*

*Id*. at 1532 (emphasis added, footnote omitted). In the present case the Trustee has produced no evidence tending to show that the Debtor retained any sort of secret interest in the Chrysler after the funds transferred by her to Shane were used to help pay it off. There was not even any evidence as to whether the Debtor regularly drove the vehicle or exercised any other traditional benefits of ownership. Thus, the continuing concealment doctrine does not apply here and the transfer of funds

involving the Chrysler will not be further considered because it occurred outside the one-year statutory window.

Finally to be considered is the second element under which the Trustee must show that the Debtor subjectively intended to hinder, delay or defraud creditors by means of the two "surviving" transfers.   As with the intent component discussed previously under *Section 727(a)(4)(A)*, it is highly unlikely there will ever be direct proof of a subjective intent to hinder, delay or defraud.  For that reason, intent may be inferred through the use of circumstantial evidence or inferences drawn from a course of conduct by the debtor.  *In re Roach*, 2014 WL 1884345 *5 (Bankr. W.D. Pa. 2014).   The Court may also consider the presence of certain "badges of fraud," such as a close relationship between transferor and transferee, if the transfer was in anticipation of a pending suit, if the debtor was insolvent or in poor financial condition at the time, if all or substantially all of the debtor's property was transferred, and if the debtor received inadequate consideration for the transfer. *Von Kiel*, 550 Fed. Appx. at 109.

The Court finds the subjective intent question to be a close one.  There are certainly factors pointing toward the presence of a subjective intent here to hinder, delay or defraud creditors. The fact that the Debtor denied having made any transfers of assets in the five years preceding bankruptcy, and denied having made any transfers of real estate within the ten years preceding bankruptcy is troubling to the Court.  While not strictly relevant to meet the required statutory elements under *Section 727(a)(2)*, for the reasons discussed above, such deception could certainly be explained by an improper subjective intent accompanying the transfers.  There are also some badges of fraud present – the Debtor and Shane, the transferee, are in a very close relationship and the Debtor appears to have been in poor financial condition at the time the transfers were made.

20

On the other hand, there are also factors tending to show that the two transfers in question were simply made as part of the natural flow of the vagaries of the marital relationship of the Lybrooks, unaccompanied by any subjective intent on the part of the Debtor to thereby hinder, delay or defraud her creditors. For instance, if there really were some grand overall strategy to transfer assets of the Debtor into Shane's individual ownership, it seems strange that once the Chrysler was paid off in February 2013[6] it would have been traded in September 2013 as part of the acquisition of the Mercury, which was held in joint title. That would be an inexplicable step backward in such plan.

The Trustee also raised questions about the sale of the Lake Pleasant Road Property and the subsequent purchase of the Victory Drive Property, arguing that it made no sense from a financial standpoint to do so, and that the only possible explanation why the Debtor would not have been placed  on the deed to Victory Drive was because the sale and purchase were done to hinder creditors. The Debtor did provide an explanation for why the Lake Pleasant Road Property was sold, testifying that she and Shane were "living above their means" and could not keep up with the payments for the Chrysler and the home equity loan that Shane had taken out. She said the choice was to sell the house and take care of those obligations or run the risk of losing the house and the vehicle. The timing of events seems to bear this out; the Chrysler was paid off only a few days after the house was sold. The Debtor also provided another reason why the Lybrooks thought it made

---

[6]   Even though the transfer of funds involved in the payoff of the Chrysler has been found to be excluded from consideration because it occurred more than one year prior to the bankruptcy filing, the Court believes the circumstances involving said transfer are relevant on the question of subjective intent because the Trustee has taken the position that all of the transfers were part of an overall plan or scheme. Additionally, the trade-in of the Chrysler for the jointly-owned Mercury did take place within one year of the filing.

sense to acquire Victory Drive, pointing out that it was very close to where Shane's ex-wife lives. Since he has partial custody of the children from that marriage it is much more convenient to live where they are now, with expenses related to the pick-up and drop-off of the children reduced.  All in all, while perhaps the sale of the Lake Pleasant Road Property followed shortly thereafter by the purchase of Victory Drive was not the smartest economic move the Lybrooks could have made,  the Debtor's explanation as to why it was done  is at least plausible.

As to why the Debtor is not on the deed to the Victory Drive Property, her explanation is that the Lybrooks had initially made a joint loan application with Liberty Mortgage but were not approved because of her low credit score.  The Trustee seemed skeptical of that assertion, but he provided no evidence to the contrary.  The Debtor also stated  that the intent had been for her to be added to the deed after the closing had occurred,[7] but for some reason that was never done.  Again, the Court finds the Debtor's explanation in this regard to at least be plausible.

The Court would finally note that because of high debt the Debtor by her own admission had over an extended period of time, going back at least to 2008 when she was in a prior marriage, thought about the possibility of filing for bankruptcy.  The actual triggering event for the filing, however, was the collection lawsuit that was filed against her for student loan debt by the

---

[7]    The Trustee asks the Court to take judicial notice that where one spouse has bad credit and cannot secure a loan such that only the other spouse is on the note, it is nevertheless common for the spouse with bad credit to be named in and to execute the mortgage and deed right at the closing.  *See*, Trustee's Post-trial Brief at 12.  This does not strike the Court as the type of "adjudicative fact" that should be the subject of judicial notice under *F.R.E. 201*.  Furthermore, even if the Court were to take judicial notice that this is a "common practice," as the Trustee requests, that would not rule out the possibility that the Lybrooks had chosen not to or could not follow that practice in this instance, perhaps due to advice of counsel or the policies of the lender.

National Collegiate Student Loan Trust in the Erie County Court of Common Pleas at No. 10115-14,
with the bankruptcy filing being made only a few days later according to the Debtor.[8]   All of the
transfers relied upon by the Trustee pre-date the initiation of that lawsuit, which means they were
not made  in anticipation of any pending suit.  That also weighs against a finding of a subjective
intent to hinder, delay or defraud on the part of Debtor.

As indicated above, the question of the subjective intent element is a close one.  The
Trustee bears the burden of proof, by a preponderance of the evidence.  The Court is unable to
conclude that the Trustee has met that burden with respect to subjective intent, finding that under
the evidence presented it is just as likely that the transfers involving the Victory Drive Property and
the Mazda were innocently done for other reasons as that they were done with the intent to hinder,
delay or defraud creditors.  Hence, the Trustee having failed to meet his burden as to the second
element, the Court finds in favor of the Debtor as to the claim of nondischargeability based on
*Section 727(a)(2)(A).*

## CONCLUSION

The Court recognizes that a denial of a debtor's discharge is a drastic remedy and a
determination that must be strictly construed in favor of the debtor.  *In re Hickman*, 2014 WL
348538 *11 (Bankr. D. N.J. 2014).  A complete denial of discharge is an 'extreme step' that "should
not be taken lightly."  *Rosen*, 996 F.2d at 1531.

---

[8]      The exact date of the filing of the collection lawsuit was not disclosed at trial.  The
docket number for the case, as listed in the SOFA would indicate it was filed sometime in 2014,
which given the date of the bankruptcy filing means it would have likely been filed in January or
February 2014.

23

By the same token, notwithstanding the underlying goal of bankruptcy law to provide a fresh start, a discharge under *Section 727* is a privilege, not a right, and may be granted only to the honest debtor. *Hickman, id.* Where a debtor has been dishonest in her dealings with the Court, or her creditors, it may be appropriate to deny her discharge. This is necessarily so because the overwhelmingly large number of bankruptcy filings each year means the success of the bankruptcy process substantially depends upon and requires the complete and candid disclosure by a debtor of all of her assets, income, expenses and liabilities. *Oakley*, 503 B.R. at 424. For the system to work effectively, because exhaustive investigation of a debtor's financial condition by a third party is wholly unrealistic, the courts can accept nothing less. For this reason there is an expectation of honesty on the part of debtors because,

> [t]he operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive. The omission of assets may be a good reason to deny or revoke a discharge.

*Id*. (quoting *Payne v. Wood*, 775 F.2d 202 (7th Cir. 1985)).

It may seem unfair to deny this Debtor a discharge when no doubt other debtors have managed to go through bankruptcy and receive a discharge while being less than totally honest about their assets and financial dealings. The limitations of the system are such that it is impossible to detect every such instance. The best the Court can do is to examine those cases of this nature that do come to its attention and apply the standard the law requires. Unfortunately for this Debtor, her misstatements were discovered and she was called upon to account for them. Even recognizing the

24

gravity of its action here, and giving the Debtor the benefit of any doubt, the sheer scope and

magnitude of her misstatements simply cannot be overlooked if the Court is to do its duty.  The

Court can only hope that going forward the Debtor will learn a lesson from the consequences of her

actions, and perhaps thereby gain some ultimate benefit.  It is also hoped that the result here will

deter others from succumbing to the temptation of dishonesty in their bankruptcy filings and

representations.  For the reasons given, the Debtor will be denied a discharge pursuant to *11 U.S.C.

§727(a)(4)(A).*

       An appropriate order follows.

Dated: September 23, 2015

Thomas P. Agresti. Judge
United States Bankruptcy Court

25